Case number 25-756, Kenithia Alston. Individually in that special administrative estate of Mr. Marquis Alston, District of Columbia Officers X, Y, A, and Z, and their individual and official classes, want to caution Caleb DeMurray, the appellant. Ms. Ruscinario for the appellants, and Mr. Hearn DeZolo for the appellants. Good morning. Good morning, Your Honors. Ms. Ruscinario? Ruscinario. Are you Russian? Ruscinario. Good morning, Your Honors, and may it please the Court, Ms. Ruscinario, on behalf of the Metropolitan Police Department Officers Ronald Cook and Caleb DeMurray, and I'd like to reserve three minutes for rebuttal. Officers Cook and DeMurray are entitled to qualified immunity because a complaint in this case, which incorporates the officer's body-worn camera footage by reference, fails to state a Fourth Amendment violation. Now, we raised an initial argument in our brief about how even the four corners of the complaint fail to state a claim for which relief can be granted, and I'm happy to address any questions about that argument, but I think the more straightforward path here is to focus on the body-worn camera footage, which contradicts any allegation that the officer's use of force in this case was not reasonable, and this is because the body-worn camera footage shows that Mr. Alston, while fleeing from officers, stopped his flight, turned around to face the officers while extending his arm away from his body and holding an object that appears to be a gun, or at the very least, that a reasonable officer could have believed was a gun. What's your best legal argument for considering the video? I mean, it's not really contested, and maybe that's the end of the matter, but it seemed a little tricky to me. I which talks about a written instrument doesn't seem to fit that description. Yes, Your Honor. So, I think it does come through 12C, and I agree. 10C, right? Yes, yes. Something that is attached to the complaint, and, you know, of course, that have considered these sorts of exhibits, including videos, have found them to be incorporable by reference in the same way that emails or other written documents are. There's, you know, the Supreme Court has said in Taleb that when you consider a complaint, you look at all of the allegations of the complaint, and you look at the complaint in its entirety, and that includes anything that's incorporated by reference, and there hasn't been any argument here that a video is a distinct type of document that, because it's not written, cannot be incorporated by reference in the same way that a contract or an email or a photograph can be. So, I think the general position is that, in general, when you're looking at a complaint, you look at the entirety of it and look at whether any of the allegations internally contradict each other, and when you do that, you look at the exhibits, at anything incorporated by reference, and we've seen courts consider these videos and other similar documents, you know, in the Sixth Circuit, Fourth Circuit, Eighth Circuit, Tenth Circuit, Eleventh Circuit, Fifth Circuit, and so it's been pretty universally considered. I mean, we have authority that's a little bit more nuanced about incorporation by reference, and I'm thinking about Banneker Ventures versus Scram, in which we say the incorporation by reference doctrine has limits, the document comes before the court as an attachment to a defendant's motion to dismiss, or as cited within it, it may not be appropriate for the court to treat the entire document as incorporated, and we talk about how other circuits have followed that approach, and so there's a question here whether the uses that the plaintiff is making are appropriately seen as limited to those, and that the consideration of the balance of those, you know, documents, the body-worn camera videos, would have to await a later stage. I mean, again, Your Honor, plaintiffs never contest that the full video has been incorporated by reference in the complaint, and they cite it repeatedly in their complaint, and that's why it's incorporated by reference, not because it's attached as an exhibit to the defendant's motion to dismiss, but because the plaintiffs repeatedly refer to it and repeatedly refer to the facts reflected in the body-worn camera footage as part of their allegations. Let me ask you, Ms. Rochonaro, even on appeal from a denial of qualified immunity, I don't think that this court has ever, in a case in which police use deadly force, that we've ever dismissed a case on qualified immunity grounds at the pleading stage. Are you aware of any such case? I'm not aware of any case in this court. Now, there are cases in other circuits. What are you referring to in other circuits? Because all the cases that you cited in your brief, I found one 20-some-year-old case in the 11th Circuit. That's the only case I found. Well, so there's Garcia v. Doz, which was the 2015 case in the Second Circuit, where the Second Circuit reversed a denial of qualified immunity at the motion to dismiss stage, in part because the video contradicted the plaintiff's allegations that the officers had given the plaintiff's permission to go into the street. And that was pleading stage? That was a pleading stage. That was a motion to dismiss. Another one was Bailey v. City of Ann Arbor. So, that is a Sixth Circuit case that was decided at the motion to dismiss stage. That one involved a false arrest claim, but the Sixth Circuit reversed denial of qualified immunity at the motion to dismiss stage because the video contradicted the plaintiff's allegations that a surveillance footage hadn't shown someone who matched the description of the plaintiff. There's Anderson v. Estrada, which we cited in our reply brief. That is a Fifth Circuit case that reversed a denial of qualified immunity at the motion to dismiss stage. That case involved an arrest after a DUI, where the officers had used a stun gun while trying to get an individual into a vehicle, and it had caused his death. The court looked at the video and said the video contradicted the plaintiff's allegations that the individual hadn't actively resisted arrest, and it reversed the denial of qualified immunity at the motion to dismiss stage because of that. And then East Step v. City of Nashville, which is a case that we cite in our response, in our reply brief, in the section about subsequent shootings. But that one also was at the motion to dismiss stage. The court looked at the body-worn camera footage, and it saw that the individual in that case did two quick steps towards the officer and then pulled out something from his jacket and pointed it at the officers while holding it in two hands. And those are all cases in which the person was shot and killed. Bailey—sorry, Anderson v. Estrada involved a taser. They weren't shot and killed. So they weren't shot and killed there. East Step was an individual that was shot. I'm not sure if he was killed, but I believe that he was. And Garcia? Garcia was a false arrest case. Okay, I'm specifically asking about where somebody is killed. So Anderson v. Estrada, the officers used a stun gun against the individual. The individual died, and the court looked at the video and said it contradicted plaintiff's allegations that he didn't actively resist arrest.  Bailey was a false arrest claim. Not—nobody died. No one died there. So you didn't cite Flife v. District of Columbia, a 2015 case from this court, and that was a unanimous opinion by Judge Tatel, joined by our former colleague, now Justice Kavanaugh, and we recognize in that case the special difficulties. You're nodding because you know about this case, but you didn't say that. We thought that Flife is distinguishable because Flife, well, one, it involved a knife instead of a gun, but also it was at the summary judgment stage, and there were issues of material fact that were disputed. That's what this court held. So the part of the case that I'm pointing to talks about the difficulties faced by a plaintiff's decedent, you know, the plaintiff's representative, a dead person's representative who is challenging the use of deadly force, and in that case, apparently consistently with every other circuit to have considered the issue, adopted a particularly cautious approach to drawing inferences in the officer's favor. And you're right that that was at the summary judgment stage, but I wonder if it isn't an even stronger sort of cautionary rule for the motion to dismiss stage, and what we said in that case is that the person who's in the best position to give the perspective opposing that of the officers is dead, and so there's a special reason to be cautious about drawing inferences in the officer's favor, and there it was even at the summary judgment stage. And to be clear, Your Honor, we're not asking the court to draw reasonable inferences in the when there's reasonable inferences that can be drawn in the plaintiff's favor. So we're saying, you know, assume all the well-pleaded allegations are true, draw reasonable inferences in the officer's favor, but then when you look at the body-worn camera footage, does it contradict any potential allegation that the officer's use of force here was unreasonable? And we agree that there are some aspects of the encounter here that are not clear from the body-worn camera footage, and that's the beginning of the encounter. So if we look at the pleading stage and we take the image of Mr. Alston as pleaded, it shows somebody with an object in his hand. We draw inferences in the plaintiff's favor, so does that mean we can or should or must assume that because it could be a phone, that at this stage, it is a phone? Your Honor, we disagree that it can be a phone, and it's not just a still image of Mr. Alston turning towards the officers holding this object. It's everything around the shooting. So you have Mr. Alston turning towards the officers holding what looks like a gun. It's the same size, shape, color as a gun. He's holding it the way one holds a gun. What authority do we not draw the inference in the plaintiff's favor that what he turns and is holding is a phone? We're at the pleading stage. Even if the court draws that inference, that it could be a phone doesn't resolve the analysis, because the question is, what would a reasonable officer have perceived this to be? And I think that when you look at the video, it's clear that a reasonable officer could have thought this was a gun. He's holding it the way one would hold a gun. And the officer doesn't have to definitively identify this as a gun before they are able to act in a split-second situation where their lives and the lives of others are at risk. And Your Honor, it's not just the image of the object in Mr. Alston's hand here. It's also that Mr. Alston turns to face the officers. A second later, you see Officer DeMeritt diving towards the ground as a shot is fired. You see that when parts, like I said, part of the video, especially about the very beginning of the encounter, are unclear. We argue that that's not material to the ultimate determination here. But what is clear, for example, is the officers are not holding a weapon in their hands as they're chasing Mr. Alston. So you see... On the diving and the timing of the shot, I thought that was an important argument that you made. But I also thought the district court did a very careful job in deciding the motion to dismiss. And I thought I had read the district court's opinion before reading the briefs. And I thought, what did she say about that? And that made me realize that wasn't raised in the district court. And we have a pretty strong rule against sandbagging a district court by deciding something on appeal on a basis that wasn't raised for the district court. I mean, the officers did raise in their motion to dismiss and in their reply that the officers shot after Mr. Alston shot. So that they shot after he turned towards them and raised something that appears to be a gun. So that was raised. It wasn't parsed out second by second in the... There was no claim that he had shot. It was just that he turned and he looked like he had a gun. So it was the visual claim, not that there actually was any shot. As far as what I saw in the district court. Yes, Your Honor. I can point out where it is if I'm wrong. I think the claim was about him turning towards the officer with his arm extended before any shots were fired. And so... But when you look at... It wasn't parsed out second by second the way that we're doing now. But I think that the court... The video stands for itself and the court can look at the video and should not ignore the facts that are clear from the video. Especially in a qualified immunity case where the officers are entitled not to undergo discovery or further litigation if it's blatantly clear that there is no claim here that their use of force was reasonable. Counsel, am I... I'm misinterpreting the statement. It seemed to me that the video from the officer who was further behind, Mr. Alston, shows... Well, first that we... Pardon me. We hear a shot. Yes. Shows the officer in the lead talking and at that time drawing his gun. When we look at the tape of the officer behind and we see that all of that happens before either officer has drawn a gun. That's correct, Your Honor. So it's quite clear that Mr. Alston fired a gun and did so first. We believe so, Your Honor. And especially the... So you look at Officer DeMera's body-worn camera footage. So at 23 hours, 11 minutes, and 45 seconds, you see his right hand not holding any weapon in his hand. The same thing with Officer Cooke at 23 hours, 11 minutes, and 46 seconds. That's the exact time that Mr. Alston turns towards the officer with his arm extended. We see on Officer... Sorry, Cooke's body-worn camera footage that he doesn't have a gun in his hand. The first shot is one second later and we see Officer DeMera on Officer Cooke's body-worn camera footage, as you mentioned, from behind as he's drawing his gun while he's on the ground. And we see Officer Cooke draw his gun one second later. And so we do contend that it is clear from the body-worn camera footage that Mr. Alston had a gun. He fired first. And therefore, this court should not ignore the of that video when it is considering disappeal. Just for remanding, Mr. Alston's not coming back. I'm not sure what can be added, frankly, to the record here. I mean, there's forensic evidence, witness dismissal, and other things. Yeah, but we're at the motion to dismiss. We're taking the plaintiff's allegations. Yes. So you say you're taking the plaintiff's allegations as true and you make quite a point about you say that the complaint never alleges that Mr. Alston was unarmed or that he didn't fire. But I read the complaint to have alleged, I mean, the mother wasn't there, right, on the scene. Right. So what it does allege, consistent with Rule 11, is that multiple witnesses on the scene at the time of the shooting deny ever seeing Mr. Alston with a gun or hearing any crossfire. So you put a lot of emphasis on there's no denial about being armed or shooting. But that seems to me, if trying a fair inference, the plaintiff's favorite, that there is such a pleading. And we don't think that the pleading about the witnesses is sufficient. That's just because they don't plead any information about the witnesses' position or what they could have seen. But, Your Honor, even if you don't agree with us and you think that the complaint adequately alleges on its four corners that Mr. Alston was unarmed, that allegation is contradicted by the video. And when you have a video that contradicts an allegation in the plaintiff's complaint, courts should look at the facts as they are shown in the video and not take the truth of matter asserted for the plaintiff's allegations. So if the court has no further questions, we ask that the court reverse and remand with instructions to dismiss the Fourth Amendment claims against Officers Cook and Demeritt. Thank you. And we'll give you rebuttal time. Mr. Hern-Desautels? Desautels, yes. Desautels. Yeah. It's a tough one to pronounce. Good morning, Your Honors. May it please the Court. Gabriel Hern-Desautels on behalf of Plaintiff Appellee Kenethia Alston alongside Supervising Attorney Alexander Afnan. Your Honors, this appeal is improper for two reasons. First, the defendants have failed to establish that this those claims rest entirely on disputed facts, not on abstract questions of law. But isn't that a standard appeal? I mean, under Pearson v. Callahan, the qualified immunity inquiry is these two steps. One is, was there a constitutional violation at all? And even if there was, was it or was it was the law? And in this context, it's the law as applied in the particular context clearly established. And so on an interlocutory appeal, we're going to ask, does the complaint, the allegations of the complaint, plausibly allege, drawing inferences in plaintiff's favor, state A, a case of a plausible claim of excessive force, and B, was it clearly established? I don't even follow that argument, honestly. Okay. Well, first, Your Honor, the second prong of the qualified immunity standard, the clearly established prong was not raised in the defendant's opening brief. We have not had a chance to adequately brief the issue. And this Court has, you know, fairly clear standards when it comes to when an argument is forfeited, when it's only raised for the first time in a reply brief. But I guess, I mean, if there's no violation at all, there's no violation of clearly established law. And that is what- Prong two is a fortiori from a prong one argument. And that's what the defendants are arguing, Your Honor. They're arguing prong one. The substance of their brief is devoted to contending that there was no violation to begin with, and that the officers acted objectively reasonably under the circumstances. I mean, I'm not sure what prong one versus prong two matters for purposes of Judge Pillard's question. I mean, my take on appealability was that Iqbal holds that Johnson does not bar a QI appeal from a denial of a motion to dismiss, where we're talking not just about pure legal claims that would have been cognizable under Conley v. Gibson, but we're talking specifically about pleading sufficiency, which is what Iqbal said you could do on a 12B6 appeal. Right. And, you know, the Johnson standard applies when an appeal raises factual disputes. On summary judgment. On summary judgment, yes. But this Court has applied the Johnson standard at the motion to dismiss stage in Bar and v. Salazar, when it denied jurisdiction on a motion to dismiss for qualified immunity purposes, when the dispositive question was the reason. You cited one case that was pre-Iqbal, a 2009 case that was pre-Iqbal. I didn't see any post-Iqbal case. 2009, Your Honor. Yeah, a couple months before. Okay. Well, you know, I think the core issue remains, which is that qualified immunity appeals are only—interlocutory appeals from denials of qualified immunity are only proper to the extent that they raise legal questions, and legal questions are those that can only be decided in reference to undisputed facts. Well, I think you should move on from the jurisdictional point, because it seems clear to me that at the complaint stage—and I know Johnson v. Jones puts a wrinkle in it, but I found that actually somewhat confusing why in your brief you were—even when talking about the merits of the appeal, you were referring to Johnson v. Jones because this is not at the summary judgment stage. You have not had an opportunity to do discovery. We are not assessing whether there's a material issue of fact in dispute as an evidentiary matter. We're looking at the pleading. So focusing on that with the pleading standard in mind, tell us why Ms. Alston deserves to have her claim proceed. Well, as a threshold matter, Your Honor, we do believe that the fact that the majority of these cases arrive on summary judgment does cut in our favor. But on the defendant's sufficiency argument, their entire argument depends on this court construing facts and making inferences in the defendant's favor, which is impermissible at this stage of the litigation. Are you willing to have us consider the video? Yes. We do not contend that the video is incorporated, but we do contend that the video does not—our argument is that the video does not unambiguously contradict any of Ms. Alston's factual allegations. Suppose I draw two inferences from the video that I think are beyond reasonable dispute, which could not be plausibly controverted. Number one, Mr. Alston turned and had in his hand an object that an officer could think was a gun. And number two, shots were fired—someone fired shots before either officer did. If I just take those two things as given, what's left of your case? To your first hypothetical, Your Honor, the defendants have cited to no case where the mere possession of a firearm is by itself justification for officers to use deadly force. In each one of their cases that they cite for an officer's reasonableness on this point, the court was able to consider much more indicia of the alleged threat of the suspect. For example, there were 911 calls in the records that the suspect had recently committed a violent crime and was armed. That's Garza from the Fifth Circuit and Boyd from the Sixth Circuit. There were cases where, in the to de-escalate the situation by giving warnings or giving verbal commands. And crucially also, in all of those cases, it was undisputed that the suspect was armed. And, you know, the vast majority of them arrived again at summary judgment. So the mere fact that an individual has a gun does not by itself justify the use of deadly force. To Your Honor's second point about the firing of the it is not definitively apparent where that first gunshot came from. It is to me anyway, you can talk me out of this, but to me it was definitively clear that neither of the two defendants fired the first shot. And as we look pretty clear that Alston did, but put that aside. Okay. Somebody else fired the first shot. Right. Um, I think it's important to note here that we also allege in our complaint that at least six officers jumped out of two squad cars and pursued Mr. Alston. We don't see in the body cam footage any, any, um, any moment where any of those other officers are visible. So a reasonable inference that could be drawn would be drawn in our favor as is required at this stage is that the shot came from one of those officers. Even if I spot you that you have the two officers chasing the guy who's running away and turns around and has something in his hand that could be a gun and then gunfire goes off. Well, that would require Your Honor to assume that as a matter of law, that is definitively the way that an individual holds a gun and is definitively inconsistent with the way that somebody holds a cell phone. I'm just assuming that this is a chaotic situation and the officers reasonably fear for their lives. Certainly. This isn't, this is the defendants are trying to improperly limit this court's analysis to the moment of the threat. When Mr, when Mr. Alston turns around, um, and they allegedly see the, the, the object in his hand, um, they are ignoring the totality of the circumstances that begin in, in our complaint with Mr. Alston talking on the phone outside in broad daylight with a group of his friends, um, hanging out with his friends and no eyewitnesses can, can put a gun in his, in his hand and no eyewitnesses heard any crossfire. Um, at least six fully uniformed, fully armed police officers sprint at him down an alley. He turns around with, uh, with an object in his hand that is consistent with the size, shape and color of a cell phone and he's, he's shot dead. So that requires the defendant's version of the facts requires this court to assume that several, several things. First, that officer demerit, um, dove to the ground and didn't trip and fall, um, that Mr. Alston, instead of turning around with a cell phone in his hand to film the officers that were running at him, trip and fall to the side, getting out of the line of fire. It does, it does, it does require the court to assume that he, that he dove out of the way deliberately, that he was able to react, um, in, in that split second and that he even saw the object in Mr. Alston's hand when, when Mr. Alston turned around. Um, it requires the court to assume that even assuming that Mr. Alston was armed, that he was turning around with the manifest intent to fire on a group of fully armed officers. The standard is what would a reasonable officer in the position of the defendants in this case perceive? What could a reasonable officer in their position have believed, have observed and understood was the situation? You, you make a claim that there's a false arrest and an excessive force separate, separate claim. And I, I wanted to probe that cause I'm not sure that I follow it. I mean, the only seizure that the complaint alleges and is challenged on appeal is the officer's use of deadly force. When they do the jump out of the car, Mr. Alston doesn't comply. And so you don't have a seizure with the ship based on the show of force at that stage. So isn't, if you lose on the fourth amendment excessive force claim, don't you necessarily lose on the false arrest claim? If after construing all facts and making all reasonable inferences in our favor, the court finds that the initial use of force was objectively reasonable under the circumstances, then yes, our, our excessive force claim would be, would be harder to prove. But I do think that it's important to acknowledge that our second excessive force claim would, would still be maintained. I'm not following what you just said. So there is no claim of arrest based on show of force when the officers jump out of the car because Mr. Alston doesn't submit. He runs. We allege that the seizure is when Mr. Alston was shot and that the officers lacked probable cause to seize him at that point. Yes. Okay. So that's, and both claims rise or fall on that. Correct. Yes. But the, the second excessive force claim, which stems from the officers continuing to shoot Mr. Alston or shooting Mr. Alston when he was on the ground, unmoving, incapacitated, that, that claim, even if the court finds that the initial use of excessive force was objectively reasonable, that claim survives. In Plumhoff v. Rickard, the Supreme Court made clear that officers were only reasonable in continuing to shoot at the suspect in that case because he was manifesting an intent to continue escaping in a vehicle, which clearly posed a of the public. That is not the case here. We hear, we hear officer Koch after he finally does turn on his, his audio say that that Mr. Alston got rid of whatever was in his hand. A reasonable inference from that fact is that, you know, officer Koch saw the object leave Mr. Alston's hand before he was incapacitated and so could clearly no longer continue to pose a threat. Um, in addition here, your honors, the cases cited by the defense have many more affirmative indications of threat, of continuing threat from the suspect than is the case here. Um, in, in Boyd, for example, the plaintiff was on the ground, but he raised his torso up and still had a gun and pointed the gun at the officers and the court found that that was, uh, was crucial in establishing the officer's reasonableness, um, in continuing to shoot him when he was on the ground. Um, by contrast in Graves v. Malone from the sixth circuit, the court found that an officer was unreasonable in shooting a suspect with a taser, even when he was under the mistaken belief that the suspect was armed. Um, the, the Tennessee v. Garner standard continues to apply, um, in, in both excessive force cases when, uh, when a, when a fleeing suspect poses no objective, serious threat of imminent physical harm, um, the use of deadly force is, is unreasonable. And as your honor pointed out in your, um, conversation with my friends across the aisle, um, fly VDC is particularly relevant here. Um, the only disputed factual circumstance in that case was what happened when the suspect turned around and yes, it was a knife, but that's still a deadly weapon. Um, there were eyewitnesses, but nobody saw exactly what happened in that, in that precise moment. And this court found that under those circumstances, when the individual most likely to contradict an officer's potentially self-serving testimony, the court is duty bound to view that that testimony with particular skepticism. And we don't even have sworn officer testimony in this case. We have the facts as they apparently perceive them through their counsel, through their counsel in these two briefs. Um, this is precisely the case that the kind of case that cries out for discovery where we can, you know, further assess the facts, further assess, um, the forensic evidence, what the, what information the officers were armed with when they, when they arrived on the scene. Um, I see that my, my time is more than concluded. If I briefly conclude, um, the defendants are asking this court to do something that it has never done before to dismiss on qualified immunity grounds, a sufficiently pled fourth amendment claim for deadly force at the motion to dismiss stage. We ask this court to dismiss this appeal for lack of jurisdiction, or alternatively to affirm the district court's refusal to grant qualified immunity on Ms. Alston's fourth amendment excessive force and false arrest claims. Thank you, your honors. Thank you. Ms. Dastanaro. Thank you, your honors. Just a few points on rebuttal. Um, so first I wanted to just refer back to judge pillars, a discussion earlier about, uh, the sound of the gunshot and the timing of the gunshots. And you asked whether that argument had been forfeited or, um, but I did want to point out that, uh, plaintiffs have never raised a forfeiture argument and they've never argued that that wasn't properly before the district court or that discord cannot consider the timing of the shots. Um, very briefly on the totality of the circumstances and the moment of threat here. So I think, you know, we are at the planning stage. We have to take all the allegations as true. Um, and so even, but the key here and the material point is that even if the officers started chasing Mr. Alston for no reason, um, what really matters is that at the point when Mr. Alston turned around to face the officers holding a gun or what a reasonable officer could have perceived to be a gun, the use of deadly force is reasonable. And no court has ever held that a reasonable use of deadly force becomes unreasonable, uh, simply because of an interaction. Um, on the argument that it's not clear whether officer demerit dove to the ground or whether he fell, we contend that it is clear from officer Cox body or camera footage that officer demerit dove to the ground. In addition, you also see the passerby. So at the exact same moment that officer demerit dives to the ground, there's a passerby, the standing between Mr. Alston and officer demerit who plans his back at Mr. Alston ducks and starts running away. And so I think that shows it's not, this isn't just, um, there's no reasonable inference that can be drawn that this is just a trip or a fall of officer demerit. Um, I take it you're willing to rest just on the visuals of the body worn camera in the district court. You said defendants did not argue who shot first, no matter who shot first, they have a right to qualify based on what they saw. We are willing to rest just on the visuals, your honor. We just think that when it is clear from the video discourse should ignore that. Um, especially where the plaintiff hasn't argued forfeiture. Um, and finally, your honor, with respect to the shots after Mr. Alston fell to the ground, I would just point to the court's attention to the cases we cited in our brief at pages 36 to 37. And I know reply brief at pages 25 to 28, which discuss how when there is a continuous shooting and there's no break in the action and the shooting lasts a few seconds, the courts will not, uh, bifurcate the analysis or parse a few ticks of the clock in order to determine what is a reasonable use of force. So that goes to the, whether they continue to shoot him when he was down. Is it not the policy of the police when they confront, when they believe reasonably believe is, is deadly force aimed at them? Is it not the policy of the police to shoot to kill? I believe so. And I'm not sure, but I do think that like, if an officer has a reason to believe that deadly force is necessary, they have a, you know, it's reasonable for them to continue to use the deadly force until that threat has passed and they don't have to stop a continuous shooting to reassess. Now, of course, if it's clear that the person no longer poses a threat, then they're, they have to stop it. Uh, but that's not the case that we have here. So if you're on it, thank you. Your Honor. The case is submitted.
judges: Pillard; Katsas; Ginsburg